17-3326-cv
*Mara v. Rilling et al.*

# In the
# United States Court of Appeals
## for the Second Circuit

———

AUGUST TERM 2018

No. 17-3326-cv

JOHN MARA,
*Plaintiff-Appellee*,

v.

STEPHEN RILLING, EDWARD NOOK, FREDERICK HINE,
*Defendants-Appellants*,

GARY MACNAMARA, MICHAEL GAGNER, ANTONIO GRANATA, JASON
TAKACS, TOWN OF FAIRFIELD, FAIRFIELD UNIVERSITY, PATRICK CLEARY
*Defendants*.[*]

———

On Appeal from the United States District Court
for the District of Connecticut

———

ARGUED: SEPTEMBER 5, 2018
DECIDED: APRIL 9, 2019

———

Before: SACK, RAGGI, and CHIN, *Circuit Judges*.

———

[*] The Clerk of Court is directed to amend the caption as set forth above.

————————————

On interlocutory appeal from an order denying summary judgment entered in the United States District Court for the District of Connecticut (Chatigny, *J.*), defendants contend that they are entitled to qualified immunity from plaintiff's suit charging them with violating the United States Constitution and Connecticut state law in investigating and arresting plaintiff for assaulting a guest at a college New Year's Eve party. Defendants prevail because (1) plaintiff was not under arrest when interviewed by police on January 2, 2013, and, thus, police did then not need probable cause to question him; (2) probable cause for plaintiff's February 22, 2013 arrest warrant was established by a non-defective eyewitness identification without regard to plaintiff's allegedly coerced statements; (3) plaintiff's statements not being necessary to establish probable cause, he cannot claim their use in violation of the Fifth Amendment; and (4) the police procedures used at plaintiff's interview were not so egregious or shocking as to violate Fourteenth Amendment due process or to support a state claim for intentional infliction of emotional distress.

REVERSED.

————————————

THOMAS GERARDE, ESQ., Howd & Ludorf, LLC, Hartford, Connecticut, *for Defendants-Appellants*.

ANDREW BRUCE BOWMAN, ESQ., Westport, Connecticut, *for Plaintiff-Appellee*.

————————————

REENA RAGGI, *Circuit Judge*:

Plaintiff John Mara ("Mara") sued Fairfield, Connecticut police officials Stephen Rilling, Edward Nook, and Frederick Hine (appellants here) as well as other members of that police department and the Fairfield University Security Office, for alleged violations of the Constitution and state law in connection with a 2013 investigation that led to Mara being criminally charged with assault and disturbing the peace, charges that were eventually dismissed. Specifically, Mara sued defendants for false arrest, coercive interrogation, and malicious prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments, *see* 42 U.S.C. § 1983, as well as for parallel state law claims of false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress. Defendants Rilling, Nook, and Hine here appeal from that part of an order entered in the United States District Court for the District of Connecticut (Robert Chatigny, *Judge*) on September 30, 2017, which denied them summary judgment based on qualified immunity. *See Mara v. MacNamara*, No. 14-cv-1095, 2017 WL 4368612 (D. Conn. Sept. 30, 2017).[1]

For the reasons stated herein, we conclude that the record, viewed most favorably to Mara, demonstrates defendants' entitlement to qualified immunity as a matter of law because (1) Mara was not under arrest when initially interviewed by the police on January 2, 2013, and, thus, police did not then require probable cause

---

[1] The district court granted summary judgment to Fairfield Police Chief Gary MacNamara, Lieutenant Michael Gagner, Sergeant Anthony Granata, and Detective Jason Takacs. *See Mara v. MacNamara*, 2017 WL 4368612, at *7–8. Plaintiff does not challenge that decision here and, thus, we have no occasion to review it now. The remaining defendants, Fairfield University and its employee Patrick Cleary, were earlier dismissed by stipulation on February 11, 2016. Accordingly, this opinion hereafter uses "defendants" to reference only appellants Rilling, Nook, and Hine.

3

to question him; (2) probable cause for the February 22, 2013 warrant authorizing Mara's arrest was established by a non-defective eyewitness identification without regard to Mara's allegedly coerced statements; (3) Mara's statements not being necessary to establish probable cause, he cannot claim their use in violation of the Fifth Amendment; and (4) the police procedures employed during Mara's interview were not so egregious or shocking as to violate Fourteenth Amendment due process or to support a claim for intentional infliction of emotional distress. Accordingly, we reverse the challenged order, and direct the entry of judgment in favor of defendants.

## BACKGROUND

Because Mara claims that police acted unlawfully—even shockingly—in conducting the investigation leading to his arrest and prosecution, we discuss that conduct in some detail preliminary to explaining why Mara's claims fail. The following facts are undisputed or viewed in the light most favorable to Mara.

### I.     The Blackman Assault and Initial Investigation

In the course of a 2012 New Year's Eve party held at a private home in Fairfield, Connecticut, and attended mostly by vacationing college students, someone hit Philip Blackman in the head with a large bottle, fracturing his skull and causing a severe brain hemorrhage.

While Blackman was undergoing surgery on the morning of January 1, 2013, his father reported the attack to Fairfield police, prompting defendants Rilling and Nook to respond to St. Vincent Hospital. The detectives there spoke with three of Blackman's friends—Dennis DePalmer, Dan Langlais, and James Hansen—who

4

stated that, at about 12:30 a.m., they had seen unknown persons shoving Blackman out of the house where the party was being held. Langlais went to his friend's aid, but when the fracas ended, Blackman was lying on the ground unconscious. None of the three friends had direct knowledge of how Blackman was injured. They could report only that they had heard "[s]omeone" at the party state that Blackman had been hit over the head with a bottle by "Jack Mara," the plaintiff, who was then a senior at Fairfield University. App'x 404–05.

Rilling and Nook then proceeded to 1027 Fairfield Beach Rd., the site of the party, and spoke with its host, Rachel Chase. Chase told the detectives that various uninvited persons had arrived during the party and that things had gotten out of hand, with someone whom she did not know being hit over the head with a bottle.

At the Chase residence, the detectives also spoke with David O'Brien. He reported attending the prior night's party with his brother Darren. Darren had recovered the black Freixenet champagne bottle used to hit Blackman, which David O'Brien produced for the police later that day. Meanwhile, David O'Brien stated that another party guest, Luke Kazmierczak, had actually witnessed the Blackman assault.

Later on January 1, Darren O'Brien went to the Fairfield police station where he told Rilling that, at the prior night's party, shortly after midnight, he observed an altercation among people he did not know. At some point, he saw a champagne bottle roll on the ground and heard people yelling that someone had been hit with the bottle. Seeing Blackman, a friend of his brother David's, lying on the ground, Darren O'Brien grabbed the bottle and gave it to his brother for safe keeping. Darren O'Brien told Rilling that his friend, Luke

5

Kazmierczak, had witnessed Blackman's assault and that Kazmierczak and the O'Brien brothers had given chase when the assailant started running from the party down Fairfield Beach Rd. On that road, the O'Briens and Kazmierczak encountered a group of men walking toward the party. One man was shirtless, and Kazmierczak identified him to the O'Briens as the person who had hit Blackman with a bottle.

On January 1, Kazmierczak, a student at the University of Wisconsin, came to the Fairfield police station and confirmed that he had seen the prior night's assault on Blackman. He described the assailant as a white male in his 20s, with short, dark hair, who ran east on Fairfield Beach Rd. towards Reef Rd. As Kazmierczak and the O'Brien brothers gave chase, they saw persons walking toward the party. Kamierczak recognized one of the men—who was shirtless, highly intoxicated, and acting out of control—as Blackman's assailant. Shown a six-photo array that included Mara's four-year old freshman photograph, Kamierczak identified another individual as Blackman's assailant, reporting 70% certainty. Police contacted that person and determined that he was not at the Chase party.

II.     **Mara's Police Interview**

On the evening of January 1, Mara's mother called the Fairfield police to report that her son was receiving threatening text messages from Blackman's friends, accusing him of committing the New Year's Eve assault. Mara then also spoke with Rilling, and the two agreed to meet at the Fairfield police station the next day at 5:00 p.m. Prior to the meeting, William Heller, an attorney for Mara's father, called Rilling. Rilling told Heller that the police viewed Mara as a witness, not a target, and that Mara did not need an attorney at the meeting.

6

Heller told Rilling that Mara's father would likely accompany his son to the meeting.

On January 2, rather than wait for Mara to come to the police station, Rilling, Nook, and their supervisor, defendant Sergeant Hine, went to Fairfield University at approximately 4:00 p.m., deciding it would be to their advantage to interview Mara there. The officers were dressed in plain clothes and, although armed, none ever displayed a weapon in dealing with Mara that day. As Mara emerged from class, he saw police cars parked behind his own vehicle. Defendants, along with University Safety Officer Patrick Cleary, approached Mara and asked if they could speak with him on campus rather than later at the police station. Mara agreed, traveling to the university's Public Safety Office in Cleary's vehicle.[2] Defendants told Cleary not to let Mara use his cell phone en route.[3]

At the Public Safety Office, Mara was interviewed in a small room, with Rilling and Nook at a table and Mara seated in a corner. Hine observed the interview on a computer in an adjacent room. The entire exchange lasted approximately one hour and twenty minutes and was videotaped. The tape shows that Mara was never restrained or subjected to any physical force during the interview and that he and the officers maintained calm demeanors throughout.

[2] Detective Rilling testified at his deposition that he offered Mara the choice of driving himself to the Public Safety Office or having School Officer Cleary drive him, and that Mara chose the latter. Because it is not clear from the record whether this fact is disputed, we accord it no weight in viewing the facts most favorably to Mara.

[3] Although Sergeant Hine disputes such an order, in viewing the facts most favorably to Mara, we assume it was given. We note only that nothing in the record indicates whether Mara ever sought to use his cell phone when with the police on January 2.

At the outset, defendants obtained basic pedigree information and photographed Mara—explaining that "so many people" were at the New Year's Eve party under investigation that "we're just taking a picture of everybody." App'x 353.[4]  Rilling then advised Mara that he did not have to talk with the officers and could leave at any time.[5] Mara indicated that he understood.  At no time thereafter did Mara decline to answer questions or seek to leave.

Asked to recount what he had heard about the events of New Year's Eve, Mara stated that he had "heard that a kid got knocked out, with maybe a beer bottle," but professed not to know much about the assault except that the victim's friends "were really upset that night [be]cause they thought that I [*i.e.*, Mara] did it." *Id.* at 354–55.  Mara said that why they thought he did it "is beyond me." *Id.*

Mara told police that he first learned that he was the suspected assailant when he was leaving the party, at which time other partygoers came up to Mara, his older brother Sean, and three friends, "[g]etting in our face, saying that I did it" and was "dead." *Id.* at 355–56.[6]  Sean Mara tried to defuse the situation, assuring the accusers that his brother "had nothing to do with" the assault. *Id.* Mara acknowledged that he was himself "yelling back" at the crowd, which

---

[4] In some instances, what can clearly be heard on the videotape differs from the transcript provided to the court. The discrepancies are of no import to this decision.  Except as otherwise noted all quotations in this opinion derive from the videotape itself.

[5] Specifically, Rilling told Mara: "You know that you can get up any time to leave.  You don't have to talk to us.  You can just say 'I don't want to talk to you anymore,' get up and leave and no matter what." App'x 354.

[6] Mara subsequently provided defendants with the name of these friends, who were interviewed by the police.

got his brother "really . . . upset." *Id.* at 355.  Eventually, Mara and his friends walked away, going to a friend's house.

Mara told defendants that he, his brother, and their friends had arrived at the party around 1:00 a.m., and remained only about twenty minutes.  Mara stated that he had already had "a lot" to drink at an earlier party and at a local bar. *Id.* at 357.  He had no recollection of seeing an argument at the party, explaining that "[e]ven when my brother said that to me.  I um, I don't know, I don't remember it. . . . I don't know if it's because I drank so much, but I just don't remember it." *Id.* at 358.  Mara stated that it was only the next day, in speaking with his roommate, that he learned that "this kid Phil," whom Mara had met "once or twice," had been hit with a bottle, and that Phil's friends, who thought Mara had done it, were asking for his cell phone number and the kind of car he drove in order to "vandalize" it. *Id.* at 359.  Mara insisted he had "no idea" how he came to be suspected of the assault, *id.* at 363, a position he maintained throughout the interview.  Specifically, he did not know "how someone could think that it was me if the kid was knocked out before I even got to that house.  How my name was brought into it with all these kids there, I don't know." *Id.* at 362.

At about that time—some twenty minutes into the interview—Rilling told Mara that, although the police were "not accusing [him] of anything," he needed to understand that the interview was "the only opportunity" he had to volunteer an account of the prior night's events. *Id.* at 363.  Thereafter, police would examine evidence, including any videotapes of the party and any fingerprints on the bottle used in the attack, and if it incriminated Mara, he could be

9

arrested.[7]  Rilling then went further and stated that witnesses had already identified Mara as Blackman's assailant: "Do you realize that there's people that don't even know you that picked you out of a lineup?"  *Id.* at 365.  That was not the case.  Indeed, defendants knew that the only then-known eyewitness to the assault, Luke Kazmierczak, had *not* identified Mara when shown his photograph in an array.

Defendants then asked Mara about the threatening calls he had received.  He reported that when one caller told him "you['re] dead," Mara stated: "I don't know why you guys think that I hit your friend but I didn't do that," to which the caller replied, "we have witnesses" and threatened Mara with a beating "real soon" before hanging up. *Id*.

Rilling reiterated that the interview was Mara's opportunity to "wipe the slate clean" and to admit "'I got into a fight and hit him [*i.e.*, Blackman] with a bottle.'"  *Id.* at 366.  Rilling explained why it was important that Mara "be truthful" now: "[I]f for some reason this did happen, it just looks better to say 'you know what, . . . I did this thing [*i.e.*, hit Blackman with a bottle]; I don't act this way when I'm [not] drunk'"; it would "look[] a lot worse" if "it took 5 times" before Mara "came clean" because that would suggest he had "no remorse."  *Id.*

Rilling then suggested that Mara might not remember everything that happened the night before because he had been drinking—a point Mara himself had made earlier. *See supra* at 9.  Mara agreed that sometimes he did not have a full memory of times when he was drinking, but he rejected Rilling's suggestion that he might be

---

[7] As Rilling's affidavit in support of Mara's arrest warrant would subsequently report, no fingerprints were recovered from the bottle.

an angry drunk, saying, "I just have a lot of fun when I drink." *Id*. at 366–67.

Rilling told Mara that "everything" police had so far was "pointing to" him as Blackman's assailant, and if Mara "just [kept] saying 'I didn't do it, I didn't do it, I didn't do it,' it's not going to look good." *Id.* at 367. What would "look good" would be if Mara said, "you know what, you're right, I f---ed up, I can't believe that it happened." *Id.* Rilling suggested that Mara might simply have been trying to help out a friend who was caught up in a fight where things got out of control. He told Mara, "I think you kinda know a little bit more than you're saying, and I want you to understand why we're trying to talk to you here and why we're spending the time." *Id.*

Mara replied that he "respect[ed] that but—," whereupon Rilling changed course and asked Mara about his clothing on New Year's Eve. *Id.* Mara described khaki pants and a gray-striped black shirt, but stated that he was bare-chested walking to the party because his shirt was wet from a spilled drink.[8]

After the detectives asked, and Mara responded to, more questions about the party and its aftermath, Nook again told Mara that police would be checking area surveillance cameras for depictions of the Blackman assault, and reiterated the importance of Mara not waiting until the police developed evidence to arrest him before providing a truthful account of the night's events. Nook indicated (1) that it would hardly be unusual for a young man who was drinking to get into a fight, (2) that judges presented with such a situation would take into account that the young man was a college

---

[8] This comported with Kazmierczak's report of a shirtless assailant.

11

student with a great career ahead of him, and (3) that police would "go to bat" for someone who was "a man" and "owned up" to what he did. *Id.* at 372. On the other hand, if Mara, with "a straight face" and no show of emotion, simply insisted over and over again that he had no role in the fight, it would look like he was "a sociopath," who had acted with "an evil mind." *Id.*[9]

Rilling then observed that if Mara were arrested, he would face felony charges because a bottle used to hit someone over the head would be considered a deadly weapon. That would mean Mara's "career here at school is over" and "probably, actually, not probably," he would serve jail time. *Id*. Rilling stated that "[n]o one wants to see

---

[9] Nook's statement reads in pertinent part as follows:

> I have to go back, go to the house and look at the surveillance. . . . So . . . this is the chance to say—everyone at a certain point in time that's probably a young man drinks and gets into fisticuffs. You know sometimes it just ends up a little sh----er than others and it's New Year's Eve and there is this bull---t fight; whatever, let's move on. What are you going to do—apologize to the kid[?] What are you going to do—write him a love letter? [You want to say] "Let's move on; I want to finish school and we'll be done with this and no one is harassing me and my friends anymore." Because we [*i.e.*, the police] called everyone and they don't want to be harassed either. So, you know, it just looks that you're deviant. People make a decision as a human being; they're not computers. Judges are human beings and they take into consideration [the fact that] these are college kids who are doing well, have a great career and life and [admitted] "I got drunk. I got into a fight. I got my ass kicked over there." But if we go back and she contradicts everything, it just looks like an evil mindset. Like, "[C]atch me if you can and I'm going to do it again." It's all I'm saying, that we will go to bat for you and say: "F--- it, he's a man. He owned up." Our reports are pretty valuable, and you know, [] if she contradicts you and makes you look bad, we write it up and say, you know, the kid [is] obviously a sociopath, and he['s] sitting there with a straight face, he doesn't look emotional, he just told me, "no, no, no," but evidence showed otherwise. So, I just want to put that out there.

App'x 371–72.

this happen." *Id.* He suggested that might be avoided if Mara were to admit, "'I was a little bit inebriated and I f---ed up [and] I'm sorry'"; Rilling said he could "take that to [Blackman's] family and they'd be happy about that." *Id.*

Nook then had Mara repeat that accusers were telling him they had "witnesses" to Mara assaulting Blackman. *Id.* at 373. Rilling told Mara that was his problem: witnesses had implicated him in the assault, and "not just one-sided witnesses"; neutral witnesses were "saying 'it was John, it was John, it was John.'" *Id.* As earlier noted, the police then had only hearsay reports of Mara assaulting Blackman; eyewitness Kazmierczak had not identified Mara from a photo array. Nevertheless, Rilling told Mara, "We have one side. We need two sides." *Id.* Mara replied, "I'm telling you what I know," and indicated he would like to talk to some people about the prior night's events, and then contact police later in the day. *Id.* Rilling told Mara it was "absolutely fine" for him to speak with other persons, but he could not promise a second interview opportunity because the police were "under a time constraint." *Id.* at 373–74. Rilling suggested that, as things stood, Mara was "holding all the weight" for the prior night's event. *Id.* at 374 ("Everybody else pretty much . . . is walking away."). Telling Mara, "That's what we don't want," Rilling hypothesized that Mara might have hit Blackman in response to being punched himself by some other person. *Id.*

Rilling then asked Mara if he "fe[lt] comfortable enough to talk to us about this." *Id.* Mara replied, "I think I'd like to talk to some other people first and then—" *Id.* Asked with whom he would like to talk, Mara replied, "my father, possibly a lawyer." *Id.* Rilling asked if Mara was "saying you want to talk to a lawyer right now." *Id.* Mara

13

immediately replied, "No, no," explaining that his particular interest was in speaking with his brother and friends. *Id.*

Rilling then reiterated that he could not promise Mara another interview opportunity because the police were going to be turning their attention to other aspects of the investigation. Mara responded, "Well, I told you everything I have now, um, to my fullest." *Id.* at 375. Rilling told Mara that the police "know a lot more than you think we do," and suggested that perhaps "[t]here are things that happened that night that you don't want to talk about." *Id.* Mara asked if Rilling was referring to "my friend's girlfriend getting hit in the face" at the party. *Id.* Rilling and Nook urged Mara to tell them about that, which he did, with the detectives' encouragement.[10] But as it became apparent that Mara was not suggesting that the girlfriend incident had triggered the Blackman assault, Rilling asked why Mara was even bringing it up, and challenged him yet again to explain why people were "picking you out of a lineup saying that you did this." *Id.* at 378. Mara maintained, "I don't know." *Id.*

At that point—about an hour into the interview—Rilling told Mara that not only was it likely that he would be arrested but also that he would face harsh jail conditions:

> You are going to have to . . . go to court, you [are] going to have to go [to] Bridgeport. It's not like you're going to somewhere nice. . . . You're going to Bridgeport court

---

[10] *See* App'x 375 ("You're going down the right path now. You're telling us more stuff. Go ahead."); *id.* at 376 ("Do you feel a weight coming off your shoulders? In the beginning you were carrying the entire world. This is ridiculous that you are going to . . . carry weight [you] should be shedding off your shoulder right now. Tell us everything else."); *id.* at 377 ("I like where you're going with this because you're doing the right thing. You're showing that Phil was not in the right state of mind, . . . was drunk. He's as much to blame as anybody in this party.").

and you're going to have to hang out with all the people that are drug addicts, that commit crimes and all that. There's a good chance that you are going to get locked up for a little bit. You're going to end up with some guy that killed somebody, that robbed somebody, that likes to smoke crack, that likes to do drugs and does cocaine, whatever.

*Id.*

Rilling told Mara that he did not belong in that scenario: "That's not you." *Id.* But to avoid those consequences, Mara needed "to make a decision right now of how we're leaving this." *Id.* Rilling then stated that he was "getting aggravated" because Mara was "closed off" and "not wanting to tell" the police what he knew. *Id.* Mara repeated that he had told the police "everything I know." *Id.* As for people identifying him, Mara reiterated that he was "not sure" why they would do so, and stated, "I would love to find out if I actually did it." *Id.*

This prompted Rilling to pose a series of "possibility" questions to Mara, such as, "[I]s there a good chance you might have done it and you don't know[?]" Mara replied, "that could have happened . . . [b]ecause I was really drunk" and "there's a shot that I wouldn't remember but—" *Id.* at 378–79. Asked if he was "saying that you were that drunk that you could have picked up a bottle or had a bottle and hit somebody over the head with it," Mara replied, "I was drunk and I don't remember some, like a lot of, the night so there's a chance it could have happened." *Id.* at 379. These responses are the focus of Mara's coercion challenge.

Rilling then pressed Mara as to how he could clearly remember other events of the evening—*e.g.*, arguing with his brother, taking off his shirt—but not remember hitting someone over the head. Mara

15

stated, "I don't remember doing that," *i.e.*, hitting someone over the head. *Id.* Both detectives assured Mara that he would "feel so much better if everything comes out." *Id.* Mara replied, "Yea, if I knew that I did it, I would be a man and say so [and] apologize to the kid. . . . I would love to do that if I 100 percent kn[e]w I did it." *Id.* at 380. Mara told the officers that if they had "a video o[r] anything" indicating that he was Blackman's assailant, he would apologize, but, as for what he recalled, he "just c[ould]n't say I did anything." *Id.* at 382. The detectives told Mara that they didn't want him "found guilty"; what they wanted was for him "to be a man and be truthful." *Id.* They told him the idea that he "could have done it" but not remembered "is just not going to work." *Id.* Mara responded, "Then that's all I have to say. Because that's honestly all I know." *Id.*

Rilling repeated that "impartial people" had inculpated Mara, that the police were going to get an "arrest warrant" for him, and that a judge would hear that he had shown "no remorse," which could result in his being sentenced to "2 years in jail." *Id.* Mara repeated that if he "100 percent knew he did it," he would say so. *Id.* at 383. Nook asked if Mara "50 percent" knew that he did it. *Id.* Mara replied, "I don't know," stating that "[f]rom what I've been told, I had nothing to do with it[, b]ut if the people telling me that are telling me that to look out for me, then that's wrong." *Id.* He again stated, "if I did it and I knew that I did it, I need to apologize and man up about it." *Id.* at 384. And again, he asked if the police could tell him if they in fact knew that he did it. Rather than directly answer the question, Nook stated, "we're here for a reason. . . . And we'll leave it at that." *Id.*

Nook then raised the possibility that the "evidence" might have pointed police in the wrong direction, and that Mara's brother might be responsible for the assault, at least in part:

16

[I]f the evidence for some reason, for some small reason has pointed us in the wrong direction, people really need to man up because you certainly don't need to carry the weight if for some reason this evidence isn't correct. And it's not a perfect science but this is where we're at. If for some reason your brother has a part in it, I don't think he would be comfortable with you taking the fall for something that maybe he's a part of.

*Id.* at 385. Mara replied, "Right, Yea. I would just love to find out from him if he knows for sure because if I did do this I would be ashamed of myself." *Id.*

The interview concluded with the detectives—in contrast to their earlier statements about a single interview opportunity—urging Mara to call them at any time if, upon speaking to other people, he got some "lightning information." *Id.* at 387. As everyone shook hands, Nook urged Mara to "[d]o the right thing," observing, "I see you with a great future." *Id.* Mara responded, "I'd love to." *Id.*

### III. The Second Photo Array

On meeting Mara, defendants concluded that his present appearance was significantly different from that depicted in his freshman identification photograph. Accordingly, on January 3, they arranged for Kazmierczak to view a second six-photo array, this one containing Mara's January 2 interview photograph, instead of his freshman-year photograph. Kazmierczak immediately identified Mara as Blackman's assailant, this time professing 100% certainty. On January 4, Kazmierczak signed a sworn statement that he had seen Mara come up behind Blackman and hit him over the head with a dark colored bottle.

17

Defendants also showed the new photo array to David O'Brien, who immediately identified Mara as the person whom Kazmierczak had identified on January 1 as Blackman's assailant. On January 4, O'Brien signed a sworn statement to that effect, adding that he took a cell-phone photograph of Mara on January 1 because Kazmierczak had said he was positive that was who had hit Blackman. David O'Brien sent Rilling this photograph, which bore a date stamp of January 1, 2013, at 1:13 a.m. It depicted Mara, wearing a dark shirt with light stripes.

## IV.    Further Police Interviews

Over the next two weeks, defendants interviewed other party guests. On January 3, Jack Hansen, whom police had first encountered at St. Vincent Hospital, gave a sworn statement that, in the course of an altercation at the party, he saw a 6-foot tall white male, wearing a dark shirt, hit Blackman from behind with a large champagne bottle and then run down Fairfield Beach Rd. Later that night, Hansen and his friends would encounter the man, who would be identified by his brother as "Jack Mara." *Id*. at 410.

That same day, defendants interviewed Mara's roommate Thomas Freda, who told of how his girlfriend had been hit in the eye at the party by an extremely intoxicated male who was running through the crowd with his elbows flared out. Freda confronted the male, but relented when Rachel Chase said she would ask the man to leave. Five or ten minutes later, at approximately 12:45 a.m., Freda saw the man lying on the ground—presumably Philip Blackman. After leaving the party, Freda encountered John and Sean Mara and their friends on Fairfield Beach Rd. Freda told Mara about his girlfriend getting hit, whereupon Freda and his girlfriend went home and the Mara group continued toward the party. Freda reported that

18

Mara was then "pretty drunk," and acknowledged that Mara had a tendency to go overboard when in that condition. *Id.* at 411.

On January 7, Mara's friend Kyle Cullam told defendants that he was with Mara and others when, at approximately 12:45 a.m. on January 1, they left a bar and walked to the party at 1027 Fairfield Beach Rd. Mara, having spilled a drink on himself, removed his wet shirt even though it was freezing outside. En route, the group encountered Tom Freda, who told about his girlfriend getting hit at the party, but who said, "It's okay, it's taken care of." *Id.* Upon arriving at the party, Cullam saw people standing around an unknown male lying in the front yard. Cullam and his friends did not stop but proceeded toward the house, where someone bumped Mara, prompting Mara to start yelling. Cullam and Sean Mara tried to calm Mara and told him to put his shirt on, which he did before entering the house. There, a group of men accused Mara of hitting their friend with a bottle. Cullam told the group that Mara had nothing to do with that. The Mara brothers and two of their friends left the party soon after, but Cullam remained. Cullam told police he was positive Mara did not hit anyone with a bottle.

Two other Mara friends interviewed by the police, John Bradley and Matthew Kennedy, effectively corroborated Cullam's account of the evening.

On January 8, defendants interviewed Daniel Langlais, whom they had first spoken to at St. Vincent Hospital on January 1. Langlais told police that while Blackman was lying on the ground injured, he heard someone yell his name, "Dan," and saw that the person who did so was Mara, who was "jumping around crazy" with no shirt on. *Id.* at 412. Langlais, however, could not say whether Mara had been at the party before Blackman was hit.

19

On January 14, defendants interviewed Philip Blackman. He stated that he had arrived at 1027 Fairfield Beach Rd. at approximately 11:45 p.m. on New Year's Eve. He described a large party with people everywhere. At about midnight, Blackman went inside the house to watch the New Year's ball drop on televison, and the next thing he remembered was waking up in the hospital. He had no personal recollection of any altercation. Rather, friends later told him that "kids were trying to kick us out of the party" because Blackman had bumped into a girl by accident. *Id.* Blackman had no recollection of seeing Mara at the party, but stated that his roommate (who was not at the party) told him that Darren O'Brien had said that it was Mara who struck Blackman. Blackman said he was "surprised" because he had met Mara only a couple of times and had "a fine relationship with him." *Id.* at 413. Nevertheless, Blackman said that Mara had a reputation for being a "hot mess." *Id.*

On January 18, defendants interviewed Sean Mara, who told them that he had been with his brother and two friends at a bar from approximately 11:00 p.m. on New Year's Eve until 12:30 a.m., after which they all went to a party at 1027 Fairfield Beach Rd. At the time, his brother was "[p]retty drunk, . . . drunker than the rest of us and being an idiot," taking his shirt off, and refusing to put it back on when told to do so. *Id.* As the group walked to the party, they saw Tom Freda, who reported that his girlfriend had been hit at the party, which got John Mara "riled up," but Freda said, "'Don't worry, it's taken care of.'" *Id.*

Sean Mara told police that, as the group continued to walk toward the party, an unknown male came up from behind them saying that "some kid [at the party] got knocked out, he got hit in the head with a bottle." *Id.* When the group arrived at the party, they

20

saw people holding up someone who was passed out, but they just kept walking toward the house. There, John Mara got into an altercation with someone after they bumped into each other. Sean Mara intervened to calm the situation, and had his brother put his shirt back on before they entered the house. Because it was crowded inside, they did not stay long, leaving at approximately 1:30 a.m.

Sean Mara reported that, as the group was walking home on Fairfield Beach Rd., some unknown males approached John Mara and began taking his photograph on their cell phones. Mara started yelling like a "maniac" and, when more unknown men approached accusing Mara of hitting their friend over the head with a bottle, Mara started cursing at them, requiring Sean Mara to put his brother in a "choke hold" to get him to stop. *Id.* at 414. The accusers kept following the Mara brothers and their friends, saying things like, "your brother is dead bro!" *Id.* Meanwhile, Mara repeatedly accused his brother and friends of not defending him against the accusers, making Sean Mara so angry that he punched his brother "just to shut him up." *Id.* Mara then ran away, with his accusers yelling: "Why is he running away? Because he hit our friend?" *Id.* Sean Mara denied that he, or his brother, had any involvement in hitting anyone with a bottle.

## V. Arrest Warrant

On January 21, 2013, Rilling applied for a warrant to arrest Mara on charges of first-degree assault, *see* Conn. Gen. St. 53a–59 (1999), and second-degree breach of the peace, *see id.* 53a–181 (2002). In support, Rilling submitted a thirteen-page affidavit, which had been reviewed and approved by both a supervising officer, Lieutenant Gagner, and by Assistant State Attorney John Smriga. The affidavit detailed the police investigation from the time of Blackman's

21

father's January 1 call through the almost twenty police interviews already detailed. Among other things, the affidavit made clear that numerous persons reported hearing that John Mara was the person who assaulted Blackman, but that only Luke Kazmierczak and James Hansen professed directly to have witnessed the incident. It stated that Kazmierczak failed to identify Mara from a photo array containing Mara's freshman photograph, and in fact had identified another person with 70% certainty. Nevertheless, Kazmierczak subsequently identified Mara with reported 100% certainty from a second photo array containing the January 2 Mara photograph taken by the police.

The affidavit also stated that Kazmierczak and David O'Brien each told police that Kazmierczak had identified Mara as Blackman's assailant when they encountered him on Fairfield Beach Rd. on January 1, and that O'Brien both selected Mara from the second photo array as the person Kazmierczak so identified and provided police with a contemporaneous cell-phone photograph that he had taken of that person, which depicted Mara. As for Hansen, the affidavit reported that, after witnessing the assault, he encountered the assailant later that night in the company of the assailant's brother, who identified the man as Jack Mara.[11]

As for Mara's interview, the affidavit reported Mara's acknowledgment that he "could" have hit Blackman but might not remember doing so because he was drunk. App'x 408 (quoting Mara as saying, "I'm not sure, if I actually did do it, I would love to find out"; "It could have happened because I was very drunk and there's

---

[11] The affidavit does not indicate whether Hansen was shown a photo array.

22

a shot I didn't remember"; "I don't remember, I was drunk and don't remember parts of the night.").[12]

At the same time, the affidavit reported statements by various persons indicating that Mara had not assaulted Blackman and could not have done so because that event occurred before Mara and his friends arrived at the party. *See, e.g.*, *id.* at 410 (reporting Freda statement that he saw man lying on ground with people standing around him before he left the party); *id.* at 411 (reporting Cullam statement that unknown male was already lying on ground with people standing around him as he and Mara arrived at party); *id.* at 413 (reporting Sean Mara statement that group was still walking to party when unknown male said "some kid" at party had been "knocked out" when "he got hit in the head with a bottle," and, when they arrived at party, they saw someone holding up person who had "passed out").

On February 22, 2013, Connecticut Judge Robert Devlin issued the requested warrant for Mara's arrest. It appears that the warrant was never formally executed. Rather, Mara voluntarily surrendered to the Fairfield Police Department and, after police processing and arraignment in court, he was released on a $100,000 bond.

## VI.  Dismissal of the Charges Against Mara

Sometime after the arrest warrant issued, Rilling received an anonymous call from a woman who stated that police had "the wrong person" for the Blackman assault. *Id*. at 129. Two weeks later, Rilling received another call from the woman, who continued to remain

---

[12] We here quote Mara's statements as reported in Rilling's affidavit. Any differences between these quotes and what can be heard in the record, *see supra* at 8 n.4, are immaterial.

anonymous. She stated that her son—whom she refused to identify—had spent New Year's Eve with John Cordone, and it was two of Cordone's friends who were responsible for the Blackman assault. Rilling reported the call to State Attorney Smriga, who was handling the Mara prosecution.

Rilling contacted Cordone, then a student at Fairfield University, who admitted hearing about the Blackman assault, but initially denied any knowledge of how the incident occurred or who might be involved. Rilling told Cordone that the police already knew he had been with friends on New Year's Eve who had gotten into a fight. At that point, Cordone "just opened up," identifying the friends as Corey Martin and Michael Arrone. *Id*. at 134. Cordone told Rilling that Arrone had been walking around with a black champagne bottle all evening—which Rilling knew fit the description of the Freixenet bottle used to hit Blackman. Cordone said that when he left the party with his girlfriend, Martin and Arrone stayed behind. An hour or two later, they appeared at Cordone's home, Martin with no shirt on, and Arrone with blood on him. They told Cordone that they had gotten into a fight and "had to hit somebody over the head with a bottle to escape." *Id*. Cordone stated that Martin and Arrone were hoping that the incident would just "go away" and "definitely would have come forward if they knew Mara was going to be convicted." *Id*. at 483. Rilling reported Cordone's account of events to State Attorney Smriga and had Cordone memorialize it in a sworn statement dated March 21, 2013.

A few weeks later, Rilling interviewed Corey Martin who provided a sworn statement dated April 11, 2013, in which he reported that at a New Year's Eve party on Fairfield Beach Rd., he and Michael Arrone had gotten into a fight instigated by three or four

24

men. As the two friends fled the scene, Arrone said that when he saw the men hitting Martin, he (Arrone) "swung a bottle and hit one of the males." *Id.* at 484. Rilling advised Smriga of this account.

Smriga conveyed the new information to Mara's attorney who, by letter dated May 17, 2013, requested that Smriga drop the charges against his client. In his response, Smriga acknowledged that the Cordone and Martin statements exculpated Mara, but concluded that they were not dispositive. He reported that the authorities hoped to resolve the matter soon but had been impeded by their inability to interview certain witnesses. In fact, Arrone refused to be interviewed on advice of counsel, and Kazmierczak, who had identified Mara as Blackman's assailant, had ceased cooperating with the authorities. The record reveals no other police investigation of the matter between May and October of 2013.

By the fall of 2013, Smriga had concluded that he could neither successfully prosecute Mara for the Blackman assault nor arrest anyone else for that crime. Accordingly, on October 3, 2013, the state charges against Mara were dismissed.

## VII. District Court Proceedings

On July 30, 2014, Mara filed the instant action. On July 15, 2016, the Fairfield Police defendants invoked qualified immunity to move for summary judgment, which the district court granted in part, but denied as to defendants Rilling, Nook, Hine, and the Town of Fairfield (sued derivatively under a state indemnification statute). *See Mara v. MacNamara*, 2017 WL 4368612, at *7–8.

In denying defendants' motion, the district court concluded with respect to Mara's Fifth Amendment coerced self-incrimination claim, that defendants' actions, first on campus and then during the

25

interview, raised "a genuine dispute of fact as to whether [Mara's] will was overborne resulting in an inculpatory statement that was used against him." *Id.* at *5.[13] As to Mara's Fourteenth Amendment substantive due process claim, the district court identified a genuine factual dispute as to whether defendants' conduct shocked civilized sensibilities, which also allowed Mara to pursue a state claim for intentional infliction of emotional distress. *See id.* at *7.

In denying defendants' motion with respect to Mara's Fourth Amendment and state law claims for false arrest and malicious prosecution, the district court concluded that Mara had two plausible arrest claims. The first was based on his being unexpectedly confronted on campus by defendants who were armed and had used their cars to block Mara's vehicle; the second based on a deficient warrant. *See id.* at *6. The district court concluded that, at the time of the campus encounter, defendants could not claim even arguable probable cause for an arrest because they then had "no concrete evidence" linking Mara to the Blackman assault. *Id.* As to the warrant, the district court concluded that it would lack probable cause if it depended on (1) statements coerced from Mara, and (2) a photo identification by Kazmierczak tainted by suggestive procedures, both of which presented genuine factual disputes. *See id.* at *5–6.

Defendants timely appealed.

---

[13] The district court specifically highlighted Mara's age (21); his limited experience with police interrogations; his expectation that he would be going to the police station with his father simply to clear up confusion about the Blackman assault; defendants' surprising Mara on campus, blocking his car, and intimating that he had to talk to them right away; the length of Mara's interrogation (1½ hours); and defendants' telling Mara that he would be put in prison with dangerous persons, and that if he did not confess he would be considered a sociopath. *See Mara v. MacNamara*, 2017 WL 4368612, at *5.

26

## I. Jurisdiction

Because the denial of a motion for summary judgment is not a final judgment, it is generally not immediately appealable. *See, e.g., Jones v. Parmley*, 465 F.3d 46, 54 (2d Cir. 2006). An exception obtains, however, when the denied motion was based on a claim of qualified immunity, at least to the extent the immunity claim presents a "purely legal question." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *see O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir. 2003). This is because qualified immunity affords no mere defense to liability but, rather, immunity from suit, which would effectively be lost if a defendant is erroneously required to defend against a case at trial. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Saucier v. Katz*, 533 U.S. 194, 199 (2001).

Mara argues that this court lacks jurisdiction to review defendants' qualified immunity claim because it does not present a purely legal question in light of the material disputes of fact identified by the district court. *See Mara v. MacNamara*, 2017 WL 4368612, at *5–7. He is wrong. Even in such circumstances, we have jurisdiction to review a qualified immunity claim if that review is limited to undisputed facts and plaintiff's version of any disputed facts, which are accepted for purposes of the appeal. *See In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 180 (2d Cir. 2008); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003). Because we so limit our review here, Mara's jurisdictional challenge fails.

## II. Qualified Immunity

This court reviews *de novo* a denial of summary judgment to parties asserting qualified immunity. *See, e.g., Walczyk v. Rio*, 496 F.3d

27

139, 153 (2d Cir. 2007). Qualified immunity shields government officials from claims for money damages unless a plaintiff adduces facts showing that "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *accord Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013).

If the answer to the first question is no, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. at 201. That is because a defendant has no need for an immunity shield where there is no viable constitutional claim. *See Zalaski v. City of Hartford*, 723 F.3d at 388; *Holcomb v. Lykens*, 337 F.3d 217, 223–25 (2d Cir. 2003). But even if the answer is yes, or not definitively no, a defendant may still be entitled to qualified immunity if the right was not clearly established at the time of his challenged actions. Indeed, a court that decides this second question in a defendant's favor may award qualified immunity without conclusively answering the first. *See Ashcroft v. al-Kidd*, 563 U.S. at 735 (reaffirming lower courts' discretion to decide order in which to address two prongs of qualified-immunity analysis).

For law to be clearly established, it is not necessary to identify a case directly on point. But precedent must have spoken with sufficient clarity to have placed the constitutional question at issue beyond debate. *See id*. at 741. Specifically, the law must be so clearly established with respect to the "*particular* conduct" and the "specific context" at issue that "every reasonable official would have understood that his conduct was unlawful." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasis in original) (internal quotation marks omitted). If the illegality of the challenged conduct would not be so

28

apparent, officers are entitled to qualified immunity. *See Zalaski v. City of Hartford*, 723 F.3d at 389. "In short, if at least some reasonable officers in the defendant's position 'could have believed that the challenged conduct was within the bounds of appropriate police responses,' the defendant officer is entitled to qualified immunity." *Id.* (quoting *Saucier v. Katz*, 533 U.S. at 208) (alterations omitted).

This standard is deliberately "forgiving," *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010), to give public officials "breathing room to make reasonable but mistaken judgments" without fear of disabling liability, *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks omitted). Indeed, the Supreme Court has repeatedly observed that qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## III.    Arrest Claims

The Fourth Amendment protects against "unreasonable . . . seizures" of persons. U.S. Const. amend. IV. For a seizure to be reasonable, it must generally be supported by probable cause. *See generally National Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989) (stating general principle while acknowledging that neither warrant nor probable cause is indispensable component of reasonableness). Under both federal and Connecticut law, "probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d at 156 (internal quotation marks omitted); *see State v. James*, 261 Conn. 395, 415, 802 A.2d 820, 835 (2002). Probable cause does not demand that an officer's good-faith

belief that a person has committed a crime be "correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983). "It requires only facts sufficient to establish the sort of fair probability on which reasonable and prudent people, not legal technicians, act." *Zalaski v. City of Hartford*, 723 F.3d at 390 (internal quotation marks and brackets omitted).

## A. The Claimed January 2, 2013 Arrest

Applying these principles to Mara's federal and state claims of unlawful arrest on January 2, 2013, we conclude that defendants are entitled to qualified immunity.

Defendants do not here challenge the district court's determination that they lacked probable cause, or even arguable probable cause, to arrest Mara on January 2, 2013. Rather, they claim qualified immunity on the ground that they did not, in fact, arrest Mara on that date and, thus, did not require probable cause lawfully to engage him in a voluntary interview. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) (holding that police do not violate Fourth Amendment by engaging person in voluntary conversation, and "[i]f there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed"); *Rivera v. Double A Transp., Inc.*, 248 Conn. 21, 31, 727 A.2d 204, 209 (1999) (identifying unlawful restraint as element of false imprisonment). Moreover, they argue that, even when the facts are viewed most favorably to Mara, clearly established law would not have compelled "every reasonable officer" to have concluded that Mara was under arrest. *Mullenix v. Luna*, 136 S. Ct. at 308. We agree.

A person is seized within the meaning of the Fourth Amendment if, under the totality of circumstances, a reasonable

30

person would have believed that he was not free to leave. *See Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citing approvingly to test for seizure articulated in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, *J.*, joined by Rehnquist, *J.*) (noting that Fourth Amendment "seizure" occurs "only if, in view of all the circumstances . . ., a reasonable person would have believed that he was not free to leave")); *accord Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (holding Fourth Amendment seizure occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" (internal quotation marks omitted)); *State v. Mangual*, 311 Conn. 182, 197, 85 A.3d 627, 641 (2014) ("The ultimate inquiry [in determining whether plaintiff has been seized is whether] a reasonable person in [plaintiff's] position would believe that he or she was in police custody of the degree associated with a formal arrest."). The standard is objective, looking not to what a particular defendant may have thought, but to what "the typical reasonable person [would] have understood." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Newton*, 369 F.3d 659, 671 (2d Cir. 2004).

In applying this standard to a claim of qualified immunity, a court necessarily engages in a two-part objective inquiry, asking not only what a reasonable person would have understood about his ability to leave—which determines whether there was a constitutional violation—but also what every reasonable police officer would have understood from established precedent—which determines whether the right was clearly established.

The district court addressed only the first question and concluded that a person in Mara's situation could reasonably have

thought he was under arrest on January 2, 2013, because Mara was surprised to be confronted by police on campus, and the police were then "armed and had used their vehicles to block his car, preventing him from leaving." *Mara v. MacNamara*, 2017 WL 4368612, at *6. In fact, when these circumstances are viewed in context, they do not admit an objectively reasonable belief that Mara was under arrest.

First, Mara had voluntarily agreed to meet with the police on January 2. That meeting was initiated by Mara, or at least by Mara's mother, who sought police help in response to threats her son was receiving from persons who blamed him for the Blackman assault. In these circumstances, even if Mara was surprised that police came to his campus at 4:00 p.m. when their agreed-upon meeting was scheduled for the police station at 5:00 p.m., that hardly supports an objectively reasonable belief that the police were then placing Mara under arrest. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding that defendant who voluntarily went to police station and was informed he was not under arrest was not in custody)[14]; *United States v. Jones*, 818 F.2d 1119, 1125 (4th Cir. 1987) (holding defendants not in custody when they voluntarily went to police station).

Second, police had already told a Mara family lawyer that they would be speaking to Mara as a witness rather than a target, and that he did not need an attorney at the interview. Even if we assume for purposes of this appeal that the statement was somehow misleading, a person provided with such an assurance would have no objectively reasonable basis to conclude that a police request to change the time

---

[14] Mara was so informed at the start of the police interview. *See infra* at 35.

and place of the agreed-upon meeting meant that he was being arrested.

Third, the proposed change in venue was from the Fairfield police station to a security office at Mara's own university. Such a change, from a potentially more intimidating location to a lesser one, would not support an objectively reasonable belief that one was being arrested. *See United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) (explaining that interview in "less intimidating atmosphere than . . . a police station," did not support an objectively reasonable belief of custodial situation)*; see also United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) (holding that non-threatening location of interviews— one at public restaurant, another at defendant's place of employment—would not support objectively reasonable belief that one was being arrested). Nor is a different conclusion warranted because defendants thought the change might work to their advantage. That fact was not communicated to Mara and, thus, could not inform an objectively reasonable understanding of the circumstances by someone in his position. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that officers' "[s]ubjective intentions play no role in . . . Fourth Amendment analysis"). Further, insofar as Mara expected his father to join him for the interview at the police station, nothing in the record indicates that Mara ever asked to wait for his father before the on-campus interview or that he had a reasonable basis to think that such a request would be denied.

Fourth, while defendants were armed on January 2, it is undisputed that they never brandished, or even displayed, their weapons. Thus, a person in Mara's position, who had sought police help and agreed to a police interview, would have no objectively reasonable basis to think that he was under arrest because the officers

33

who came to conduct the interview were routinely armed with holstered handguns. *See United States v. Drayton*, 536 U.S. 194, 205 (2002) (stating that public knows most law enforcement officers are armed; thus, "holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon"); *United States v. Thompson*, 546 F.3d 1223, 1227 (10th Cir. 2008) (same); *United States v. Gaynor*, 262 F. App'x 341, 342 (2d Cir. 2008) (summary order) (same).

Fifth, the import of defendants and a campus security officer having parked their cars behind Mara's vehicle is at best ambiguous. Police frequently stop their vehicles in ways that impede the normal flow of traffic—much to the frustration of ordinary motorists. While in some circumstances, using police cars to box in a private vehicle might lead its driver to conclude that he is not free to leave, that conclusion would not reasonably obtain here, where the vehicle owner was not in the car or attempting to drive it at the time in question and had solicited a meeting with police. *Cf. United States v. Stover*, 808 F.3d 991, 997 (4th Cir. 2015) (holding that reasonable person would not feel free to leave when police officers blocked vehicle, flashed police emergency lights, drew weapons, and trained spotlight on blocked vehicle). Thus, although Mara professes subjectively to have concluded from the way police cars were parked that he could not have refused to go with defendants to the campus security office, the totality of circumstances would not make such a belief objectively reasonable.[15]

---

[15] As noted *supra* at 7 n.2, on reviewing the record in the light most favorable to Mara, we do not consider police deposition testimony that Mara was offered the choice of driving himself to the university security office or accompanying Security Officer Cleary, and that he voluntarily chose the latter.

In any event, a sixth factor convincingly dispels any arrest concern. The video recorded interview shows that defendants expressly told Mara—who was at no time physically restrained—that he was always free to get up and leave the interview and did not have to answer any questions. *See supra* at 8, n.5 (quoting police statement). Such a statement to an unrestrained person, viewed in light of the totality of circumstances just detailed, would preclude an objectively reasonable belief that one is under arrest. *See Oregon v. Mathiason*, 429 U.S. at 495; *United States v. Haak*, 884 F.3d 400, 415 (2d Cir. 2018) (holding that defendant who "voluntarily came to the police station," was interviewed in "standard interview room" for "not unduly lengthy" period, and who "knew from the outset that he did not have to speak with the police but, rather, could stop the interview at any time," was not in custody); *cf. United States v. Newton*, 369 F.3d at 670 (concluding that disavowal of arrest carries less weight when said to person placed in handcuffs).

Even if the facts admitted any ambiguity as to Mara's arrest status on January 2, 2013, which we conclude they do not, police officers aware of the totality of circumstances just detailed—particularly, Mara's agreement to a police meeting and the officers' express statement to Mara that he was always free to leave the interview—could reasonably have believed that Mara would *not* have understood himself to be under arrest at the interview and, therefore, that probable cause was not required to speak with him. Certainly no clearly established law would have compelled "every reasonable officer" to have concluded otherwise in the context described. *Messerschmidt v. Millender*, 565 U.S. at 546. Accordingly, as a matter of law, defendants are entitled to qualified immunity on Mara's federal and state claims of unlawful arrest on January 2, 2013.

## B. The Second Arrest

Mara maintains that he was also unlawfully arrested following issuance of a February 22, 2013 warrant for his arrest. As earlier noted, it is not evident from the record that Mara ever was formally arrested. Rather, it appears that he (or his attorney) was told that an arrest warrant had issued, whereupon Mara voluntarily surrendered to the authorities for processing and arraignment. In general, damages for unlawful arrest cover from "the time of detention up until issuance of process or arraignment, but no more. From that point on, any damages recoverable must be based on a malicious prosecution claim." *Wallace v. Kato*, 549 U.S. 384, 390 (2007); *see Hygh v. Jacobs*, 861 F.2d 359, 366 (2d Cir. 1992) (holding false arrest claim cognizable from period of arrest through arraignment). We recognize that the Seventh Circuit has held that a person who is not formally arrested, but who voluntarily surrenders upon learning of a warrant for his arrest, has a "plausible claim for false arrest" because "it is enough that he was booked; that was a seizure of his person within the meaning of the Fourth Amendment." *Albright v. Oliver*, 975 F.2d 343, 344–45 (7th Cir. 1992). We need not here decide whether we agree. The parties have not raised or briefed the issue. We conclude simply that, whether Mara properly sues for unlawful arrest or malicious prosecution in connection with the February 2013 initiation of charges against him, defendants are entitled to qualified immunity because probable cause is a complete defense to either charge, *see Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *McHale v. W.B.S. Corp.*, 187 Conn. 444, 447, 446 A.2d 815, 817 (1982), and the Rilling affidavit establishes probable cause.

An arrest authorized by a judicial warrant is generally "presumed" to be supported by probable cause. *Walczyk v. Rio*, 496

F.3d at 156 (observing that "such warrants may issue only upon a showing of probable cause"). Even where a supporting affidavit is found to be deficient in stating probable cause, "the fact that a neutral magistrate . . . issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner," so as to merit qualified immunity. *Messerschmidt v. Millender*, 565 U.S. at 546. To urge otherwise, a plaintiff must show (1) that supporting warrant affidavits "on their face, fail to demonstrate probable cause"; or (2) that defendants misled a judicial officer into finding probable cause by knowingly or recklessly including material misstatements in, or omitting material information from, the warrant affidavits. *Walczyk v. Rio*, 496 F.3d at 156.

Mara argues that this is such a case because defendants obtained a warrant for his arrest through unconstitutionally obtained evidence, specifically, (1) Mara's coerced statements of January 2, 2013, and (2) Kazmierczak's photo identification of the next day. The district court concluded that both these evidentiary challenges raised disputes of fact. *See Mara v. MacNamara*, 2017 WL 4368612, at *4–5. Then, assuming resolution of the disputes in Mara's favor, the district court determined that probable cause had to be assessed by reference to a "corrected" affidavit deleting the challenged evidence. *See Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017) (explaining that court assessing warrant application based on challenged information may "consider a hypothetical corrected affidavit" to determine if it satisfies probable cause). Identifying a "genuine dispute" as to whether such a corrected affidavit would here demonstrate even

37

"arguable probable cause," the district court denied defendants qualified immunity. *Mara v. MacNamara*, 2017 WL 4368612, at *6.[16]

We cannot sustain this conclusion. There is no basis in law for deleting the Kazmierczak photo identification from the Rilling affidavit and, with that eyewitness identification restored to the affidavit, probable cause is plainly established even without Mara's challenged statements. *See, e.g.*, *Stansbury v. Wertman*, 721 F.3d 84, 98 (2d Cir. 2013) (stating that, absent indicia of unreliability, victim's identification is typically sufficient to provide probable cause); *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000) (same re: eyewitness testimony); *United States v. Wagner,* 989 F.2d 69, 73 (2d Cir. 1993) (same re: confidential informant with respect to personally witnessed criminal activity); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (same re: sworn victim complaint); *cf. Florida v. J.L.*, 529 U.S. 266 (2000) (holding anonymous tip insufficient).[17]

First, to the extent Mara complains that it was unduly suggestive for only his photographs to be included in both arrays shown to Kazmierczak, clearly established law is to the contrary. "[T]he fact that a suspect's picture was placed in a second array after a witness has failed to select anyone from the first array [does not]

---

[16] As this court has recognized, "arguable probable cause" exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 742 (2d Cir. 2004); *accord Gonzalez v. City of Schenectady,* 728 F.3d 149, 157 (2d Cir. 2013).

[17] Because we conclude that probable cause is established without Mara's own statements, his coercion challenge to those statements is immaterial to his Fourth Amendment and state law claims of unlawful arrest. Moreover, we need not decide whether the record, viewed most favorably to Mara, admits a finding of coercion because, as explained *infra* at Part IV.A., he cannot show that the statements were used against him as necessary to claim a Fifth Amendment violation.

automatically make the second array unduly suggestive." *United States v. Concepcion*, 983 F.2d 369, 379 (2d Cir. 1992). The district court acknowledged this precedent, but thought that a case-specific review might nevertheless admit a reasonable finding of suggestivity. *See Mara v. MacNamara*, 2017 WL 4368612, at *5. It did not, however, identify what facts would distinguish this case from *Concepcion* in ways that might admit such a finding. Nor can we. Mara does not—and could not—argue that either of the photo arrays shown to Kazmierczak, which are part of the record, are themselves suggestive. Each array depicts six young, white men with short, dark hair—consistent with the description Kazmierczak gave of Blackman's assailant. In neither array does Mara's photograph "so st[an]d out from all of the other photographs as to suggest to an identifying witness that [Mara] was more likely to be the culprit." *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994) (internal quotation marks omitted).

The lack of suggestivity here is only reinforced by the fact that the two photos of Mara used in the arrays—the first taken in his freshman year, the second taken in his senior year—are markedly different. Nor does anything in the record indicate that the manner of display was suggestive. Quite the contrary: as to both displays, Kazmierczak was cautioned that it was as important to clear the innocent as to identify the guilty. In sum, Mara's suggestivity argument rests solely on the fact that he was the only person depicted in both arrays. But if, as this court has ruled, showing a witness the *same* photograph of a suspect in two different arrays is not unduly suggestive where police do not otherwise urge the photo's identification, *see id.* at 809, it necessarily follows that showing a witness markedly *different* photographs of a suspect, without doing or saying anything to urge identification, is not unduly suggestive, *see*

39

*Gregory-Bey v. Hanks*, 332 F.3d 1036, 1052 (7th Cir. 2003) (concluding "distinctly unique and different" photographs not unduly suggestive). We thus conclude that no suggestivity concern warrants deletion of Kazmierczak's photo-identification from Rilling's affidavit.

Second, even if the facts could admit a finding of suggestive procedures—which they cannot—that conclusion does not mean that Kazmierczak's identification cannot inform probable cause determinations. Indeed, this court expressly rejected that conclusion in *Stansbury v. Wertman*, which holds that "'[e]vidence need not be admissible at trial in order to support a finding of probable cause.'" 721 F.3d at 91 n.7 (quoting *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012) (interpreting *Illinois v. Gates*, 462 U.S. 213 (1983))). State law agrees. *See State v. Higgins*, 201 Conn. 462, 467, 518 A.2d 631, 634 (1986) ("The fact that [a] confession would not have been admissible at a trial does not preclude its use . . . in ascertaining probable cause."). As *Stansbury* explains, the due process limits that *Neil v. Biggers*, 409 U.S. 188 (1972), mandates for the use of identifications tainted by suggestive procedures "concern[] the admissibility of identifications at criminal trials, not whether an identification can support probable cause to arrest" a suspect. *Stansbury v. Wertman*, 721 F.3d at 91 n.7; *see Phillips v. Allen*, 668 F.3d at 915 (stating that "*Biggers* and similar decisions . . . concern the admissibility of [identification] evidence at criminal trials, not claims for damages against arresting officers"). Thus, *Stansbury* instructs that the critical question for "determining whether an identification can support probable cause," is not whether the identification procedure was suggestive, but whether it was "so defective" that, as a matter of law, "'probable cause could not reasonably be based on it.'" *Stansbury v. Wertman*, 721 F.3d at 91 n.7 (quoting *Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007)).

The one-photo displays in *Stansbury* were undoubtedly suggestive, making identifications therefrom inadmissible at trial. *See id*. at 91. But that did not render them "so defective" that they "could not contribute to a finding of probable cause." *Id.* at 91 n.7. By contrast, telling a witness he "had to pick someone" from a photo array would make the ensuing identification both inadmissible at trial and too defective to support probable cause. *See id.* (deriving scenario from *Jenkins v. City of New York*, 478 F.3d at 93). *Stansbury* explained the distinction: procedures that simply "increase the odds" that a witness will identify the defendant are not so defective as to preclude reliance for probable cause, while procedures that force the witness to make an identification do rise to that level. *See id.*

The arrays here are a far cry from the single-photo displays that *Stansbury* held suggestive—but, nevertheless, not so defective that they could not support probable cause. *See id.* at 91. Mara's photographs were included in multi-photo arrays, his two photographs were significantly different, and nothing about how the photos were presented to Kazmierczak urged an identification of Mara, much less left Kazmierczak with no option but to make such an identification. Moreover, as in *Stansbury*, Kazmierczak confirmed his identification of Mara in a sworn statement, and the police had no reason to question his honesty. Thus, on the *Stansbury* standard that properly applies here, there is no reason for the Kazmierczak photo-identification to be deleted from the Rilling affidavit. *See id.*

Third, and in any event, when applying the *Stansbury* standard in the context of a qualified immunity claim, the determinative question is not whether the challenged identification procedure could be found "so defective" that probable cause could not be based on it, but whether clearly established precedent would compel every

41

reasonable officer to recognize as much. *See Phillips v. Allen*, 668 F.3d at 917.  It would not do so here.  As already noted, *United States v. Concepcion*, 983 F.3d at 379, and *United States v. Thai*, 29 F.3d at 808, instruct that showing the same subject's photograph in two photo arrays is not necessarily suggestive, and Mara points to no authoritative decision warranting a different conclusion in the particular circumstances of this case, much less a conclusion that the procedure was "so defective" that it could not inform probable cause under *Stansbury v. Wertman*, 721 F.3d at 91. *See Phillips v. Allen*, 668 F.3d at 917.

Indeed, such a conclusion is particularly inapt here for two further reasons. First, when Rilling applied for a warrant to arrest Mara, defendants knew that Kazmierczak had an independent basis for identifying Mara that made it particularly unlikely that viewing a second photograph of him would be unduly suggestive. *See Neil v. Biggers*, 409 U.S. at 199–200 (outlining factors for determining independent reliability of identification); *United States v. Tortora*, 30 F.3d 334, 338 (2d Cir. 1994) (applying *Biggers* factors to find identification independently reliable).  Specifically, on the night of the assault—and before any contact with the police—Kazmierczak had identified Mara as Blackman's assailant to the O'Brien brothers from among a group of young men encountered on Fairfield Beach Rd.  David O'Brien confirmed that Kazmierczak made such an identification, providing police not only with a sworn statement but also with the cell-phone photograph of Mara that he took at the time of the identification.

Second, Rilling disclosed all circumstances pertinent to Kazmierczak's photo identification in his affidavit in support of an arrest warrant—specifically, the display of two photo arrays, each containing a photograph of Mara;  Kazmierczak's failure to identify

42

Mara from a freshman photograph in the first array (and 70%-certain identification of another person), and his 100%-certain identification of Mara from a more recent photograph in the second array; Kazmierczak's January 1 in-person identification of Mara to the O'Brien brothers; and David O'Brien's contemporaneous cell-phone photograph of the person Kazmierczak so identified, which depicts Mara.[18] In short, as to the Kazmierczak photo identification, defendants cannot be charged with misstating or omitting material information. Thus, with a fully informed judge raising no concern about the display of two Mara photographs to Kazmierczak; with defendants' knowledge that Kazmierczak had already made an in-person identification of Mara to friends shortly after the Blackman assault; and in light of the decisions in *Concepcion* and *Thai*, it cannot be said that every reasonable officer would be compelled to conclude that Kazmierczak's photo-identification of Mara was "so defective" that it could not reasonably inform probable cause. *See Stansbury v. Wertman*, 721 F.3d at 91 n.7; *see also Messerschmidt v. Millender*, 565 U.S. at 546.

Accordingly, we conclude that defendants are entitled to qualified immunity on Mara's federal and state claims of unlawful arrest and/or malicious prosecution stemming from the February 2013 arrest warrant because (1) the Kazmierczak photo identification was not, in fact, so defective as to require deletion from a corrected

---

[18] Even if Kazmierczak's photo identification of Mara were properly deleted from a corrected affidavit, his January 1 identification, and David O'Brien's documented corroboration of that identification, would remain. The district court did not discuss why this evidence would not be sufficient to establish probable cause. We do not pursue the point because we conclude that there is no need to correct the affidavit in support of Mara's arrest to delete Kazmierczak's photo identification.

Rilling affidavit; (2) with that eyewitness identification included, the affidavit clearly states probable cause to arrest Mara for the Blackman assault, even if Mara's statements are deleted; and (3) with probable cause thus established, it cannot be said that every reasonable officer would conclude that Mara could not lawfully be arrested or prosecuted as a result of the February 2013 arrest warrant.[19]

## IV. Statement Claims

Mara claims that defendants violated his Fifth Amendment right against self-incrimination and his Fourteenth Amendment right to substantive due process by coercing him to make inculpatory statements at the January 2 interview. He further claims that defendants' conduct violated state law prohibiting the intentional infliction of emotional distress.

In denying defendants qualified immunity on these claims, the district court concluded that the record, viewed most favorably to Mara, raised genuine disputes of fact as to whether Mara's will was overborne when he made the statements at issue, and whether police conduct was so extreme and outrageous as to go beyond the bounds of human decency. *See Mara v. MacNamara*, 2017 WL 4368612, at *5, *7. Even if we were to agree with this conclusion—which we do not for

---

[19] Insofar as Mara's malicious prosecution claim appears to challenge the maintenance of an action against him after evidence implicating another person came to light, that decision was the prosecutor's rather than defendants and, thus, cannot be maintained against them. *See Wilson v. City of New York*, 480 F. App'x 592, 595 (2d Cir. 2012) (summary order) (holding that "decision to continue prosecution after the new evidence came to light was made by the assistant district attorney and the court, not by" officers, and thus, no reasonable jury could find officers liable); *see also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (concluding that officers can only be liable for malicious prosecution action where they "have been instrumental in the plaintiff's continued confinement or prosecution").

reasons detailed below—it addresses only the first qualified immunity inquiry, *i.e.*, whether a constitutional violation could be found. The district court still needed to address the second qualified immunity inquiry, *i.e.*, whether the rights at issue were clearly established in the context presented, such that every reasonable officer would have recognized that the challenged conduct was unlawful. That is not this case.

## A. Coercion Claim

The Fifth Amendment states that no person "shall be compelled in any case to be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment extends this prohibition to the states. *See Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The right bars police from coercing involuntary statements from individuals, *see Chambers v. Florida*, 309 U.S. 227, 239 (1940), and applies without regard to whether the person is in custody when statements are so coerced. Thus, the right extends more broadly than the prophylactic procedures mandated in *Miranda v. Arizona*, 384 U.S. 436 (1966), which apply only to persons in custody to "secure the privilege against self-incrimination" in that particular context. *Colorado v. Spring,* 479 U.S. 564, 572 (1987) (internal quotation marks omitted).

An actual violation of the right against self-incrimination occurs, however, only when a coerced statement is used against a person "at trial." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990); *accord United States v. Allen*, 864 F.3d 63, 82 (2d Cir. 2017) (observing that violation of Fifth Amendment right against self-incrimination "'occurs *only at trial*,' even if 'conduct by law enforcement officials prior to trial may ultimately impair that right'" (quoting *Verdugo-Urquidez*, 494 U.S. at 264 (emphasis in original))).

Because Mara's case was dismissed, no challenged statements were ever used against him at trial.

To the extent he complains that his statements were used to support an arrest warrant that would otherwise have lacked probable cause, his claim would appear to invoke the Fourth Amendment right against unreasonable seizures. We need not pursue the question of how the Fourth and Fifth Amendments might interact in such circumstances. *See*, *e.g.*, *Michaels v. New Jersey*, 222 F.3d 118, 123 (3d Cir. 2000) (concluding that constitutional guards against coerced confessions only apply when statements are used at trial, not in arrest warrant). For reasons discussed in the immediately preceding point of this opinion, we conclude that, even when Mara's statements are deleted from the warrant application, the remaining facts, specifically, eyewitness Kazmierczak's identification of Mara as Blackman's assailant, convincingly established probable cause for his arrest. Thus, because Mara can demonstrate no Fourth or Fifth Amendment injury from the use of his statements in a warrant affidavit otherwise supported by probable cause, defendants are entitled to qualified immunity on his coerced self-incrimination claim.

## B. Substantive Due Process Claim

Mara nevertheless claims that, whether or not his statements were used against him, defendants' tactics in procuring them violated his right to substantive due process. *See Chavez v. Martinez,* 538 U.S. 760, 773 (2003) (Thomas, *J.*) (plurality opinion) (observing that "Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause, would govern" such a claim). To maintain that claim, Mara must show more than official misconduct, or even coercion. He must show that defendants'

conduct in questioning him was "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see Rochin v. California*, 342 U.S. 165, 172 (1952); *accord Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007).

The Supreme Court identified such conduct in *Rochin*, where police broke into a defendant's home, attempted forcibly to pull drug capsules from his throat and, finally, pumped his stomach to retrieve the capsules. *See Rochin v. California*, 342 U.S. at 166. As the Court explained, such conduct was "too close to the rack and the screw to permit of constitutional differentiation." *Id.* at 210. Not so, however, the conduct in *Chavez v. Martinez*, 538 U.S. at 774 (holding that questioning defendant then being treated for multiple gunshot wounds did not shock the conscience), or *County of Sacramento v. Lewis*, 523 U.S. at 854 (holding officer's high-speed pursuit of suspect, even if undertaken imprudently and with deliberate indifference to human life lost in ensuing collision, did not shock the conscience). Nor the conduct in *Lombardi v. Whitman*, 485 F.3d at 81–85 (holding that officials' allegedly false reassurances as to air safety in lower Manhattan after 9/11 attack did not shock the conscience). In short, to shock the conscience and trigger a violation of substantive due process, official conduct must not only be wrong; it must be extremely so, "truly brutal and offensive to human dignity." *Id.* at 81 (internal quotation marks omitted).

A Connecticut claim for intentional infliction of emotional distress similarly requires conduct that is "extreme and outrageous." *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337, 1342 (1986) (instructing that claim requires showing "(1) that the actor intended to inflict emotional distress; or that he knew or should have known

that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe"); *accord Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443, 815 A.2d 119, 126 (2003) (holding that claim can be maintained "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community").

Applying these standards here, we conclude that defendants' conduct during Mara's non-custodial interview—which we have described in detail and which is all video-recorded and undisputed—cannot be characterized as so brutal and offensive, or so outrageous and intolerable, much less so extreme, as to recall the rack and screw or other unjustifiable intrusions on "bodily integrity." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (characterizing *Rochin* as delineating the right "to bodily integrity"); *see also United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (observing that legal significance of video-recorded—and, therefore, undisputed—interview conduct is properly decided *de novo* on appellate review).

The video-recording shows that Mara's interview, while sometimes tense—as might be expected when criminal conduct is being discussed—was conducted calmly by officers in plain clothes who did not raise their voices, display weapons, or physically restrain Mara. At the start of the interview, Mara was told he did not have to answer any questions and could leave at any time. Mara confirmed his understanding of these ground rules. When, later in the interview, Mara suggested that he might want to speak with a lawyer, questioning stopped until Mara clarified that he was not requesting

48

to speak to a lawyer at that time. Such circumstances, which have informed our decisions granting qualified immunity on coerced-confession claims, *see, e.g., United States v. Haak*, 884 F.3d at 415; *Parsad v. Greiner*, 337 F.3d 174, 184 (2d Cir. 2003); *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995), are hardly indicative of police conduct so brutal or extreme as to shock the conscience.

The same conclusion obtains with respect to both the place of the interview, an office at Mara's college, which was certainly less intimidating than the police station where he had earlier agreed to be interviewed, *see United States v. Courtney*, 463 F.3d at 337; and its hour and a half duration, *see Rajah v. Mukasey*, 544 F.3d 427, 445–46 (2d Cir. 2008) (holding seven hours of questioning, with two stints in jail cell, was "long and tiresome" but not shocking). Nor is a different conclusion warranted if, as Mara contends, defendants changed the time and site of the interview to avoid his father's attendance. As earlier noted, Mara does not state that he asked to delay the interview until his father arrived. *See supra* at 34. In any event, Mara was 21 years old, college educated, and, as the video-recording shows, well-spoken and self-possessed. Questioning an adult in the absence of a parent is not so brutal, intolerable, or shocking as to violate due process or intentionally inflict emotional distress. *Cf. Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 348 (2d Cir. 1998) (rejecting due process challenge to short detention, even of minor).

Insofar as defendants, in the course of the interview, told Mara that it would be to his benefit to cooperate and that, otherwise, he would be prosecuted to the full extent of the law, such statements are not even coercive, let alone conscious-shocking. *See United States v. Haak,* 884 F.3d at 412 ("[T]here is nothing improper in police truthfully telling a [suspect] that he will be prosecuted to the full extent of the

law if he chooses not to cooperate."); *United States v. Ruggles*, 70 F.3d at 265 (holding statements conveying benefits of cooperation are "not improperly coercive" but, rather, "common sense factual observations"). To the extent defendants went further, implying that cooperation might prompt the Blackman family to forego pressing charges, while prosecution would put Mara in jail with killers, robbers, and drug addicts, such tactics may inform the voluntariness of a defendant's ensuing statements and, therefore, their admissibility. But no clearly established precedent holds such conduct conscious-shocking or intolerable as required to demonstrate a violation of due process or intentional infliction of emotional distress. *See, e.g.*, *Rochin v. California*, 342 U.S. at 171; *Huguez v. United States*, 406 F.2d 366, 381–82 (9th Cir. 1968) (concluding that officers' forcible removal of drugs from rectum of handcuffed defendant held spread-eagled on table constitutes conscious-shocking conduct); *cf. Green v. Scully*, 850 F.2d 894, 903 (2d Cir. 1988) (observing, in case where one officer improperly referenced electric chair while other officer said case was not about electric chair, that other evidence showed ensuing admissions were not coerced).

The same conclusion obtains with respect to defendants' misrepresentations about the strength of the evidence against Mara, specifically, the insinuation that the police already had eyewitness identifications of Mara as Blackman's assailant when, in fact, the only eyewitness then known to the police, Kazmierczak, had failed to identify Mara in the first photo array shown to him. This conduct, too, is relevant to voluntariness. *See, e.g.*, *Frazier v. Cupp*, 394 U.S. 737, 739 (1969) (holding that officer's false statement, although relevant to voluntariness, did not render particular confession inadmissible); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (holding that even if agent's statements were "false, misleading, or intended to trick

50

and cajole" defendant into confessing, suppression was warranted only if totality of circumstances showed defendant's will was overborne by agent's conduct); *Green v. Scully*, 850 F.2d at 903 (stating that officer's false representation of fingerprint match "makes the issue of voluntariness in this case such a close one" but, nevertheless, finding confession voluntary). Nevertheless, it is not so outrageous or conscience-shocking as to violate due process.

This is not to condone all police deceit or trickery, which can, after all, take various forms, from undercover operations, *see Hoffa v. United States*, 385 U.S. 293 (1966) (identifying no coercion in such circumstances), to threats to child welfare, *see Lynumn v. Illinois*, 372 U.S. 528, 534–35 (1963) (holding coercive repeated police misrepresentations that suspect would be deprived of financial aid for dependent child). It is simply to note that government misrepresentations about the strength of its evidence may inform voluntariness; but such conduct here is not so outrageous or inhumane as to violate due process or Connecticut law.

Nor is a different conclusion warranted by the district court's observation that defendants "did not relent" until they got Mara to say that "their version [of events] might be true," *i.e.*, that Mara "could" have hit Blackman and not remembered because of how drunk he was on New Year's Eve. *Mara v. MacNamara*, 2017 WL 4368612, at *5. Like the other conduct discussed, persistent questioning may raise voluntariness concerns, but it does not violate substantive due process. *See Chavez v. Martinez*, 538 U.S. at 775–76 (holding that even if persistent questioning implicates liberty interest, it is not conscious-shocking). Indeed, Mara himself appears to have sown the seed for the challenged police query about what he could have done without remembering. Early in the interview, Mara volunteered

that it was only after the fact that he learned of an argument at the party where "Phil" was hit with a bottle. App'x 359. He himself did not "remember" these occurrences, explaining, "I don't know if it's because I drank so much, but I just don't remember it." *Id*. In these circumstances, it was not shocking or brutal for police to have pressed him as to whether he might also fail to remember being the person who hit Blackman.

In sum, because Mara's interrogation cannot be characterized as brutal or extreme, he cannot show a violation of substantive due process or state tort law, much less show that established precedent would have required every reasonable officer to have recognized such violations. Accordingly, defendants are entitled to qualified immunity on these claims.

## CONCLUSION

To summarize, we conclude that qualified immunity entitles defendants Rilling, Nook, and Hine to summary judgment on all Mara's constitutional and state law claims.

1. As to Mara's false arrest and malicious prosecution claims:
    a. The record cannot support an objectively reasonable belief that Mara was under arrest on January 2, 2013, and thus, every reasonable police officer would not have been compelled to conclude that probable cause was required to interview Mara on that date;
    b. The February 2013 warrant for Mara's arrest was supported by probable cause, specifically, Kazmierczak's January 3, 2013 photo-array identification of Mara as Blackman's assailant. Precedent would not compel every reasonable officer

52

to conclude that the circumstances of that identification—inclusion of a different photograph of Mara than that used in the first array—were unduly suggestive, much less so defective as to preclude the identification from informing a probable cause determination. Thus, Mara's second arrest claim fails without regard to whether allegedly coerced statements are deleted from the warrant affidavit. The same probable cause conclusion defeats Mara's claim of a maliciously initiated prosecution.

2. Because Mara's allegedly coerced statements were not necessary to establish probable cause for an arrest warrant—their only use—he cannot maintain a coercion claim under the Fifth (or Fourth) Amendment or state law.

3. The procedures used to interrogate Mara, including deceit and fear, were nevertheless not so shocking, brutal, and inhumane that every reasonable police officer would be compelled to recognize that they violated substantive due process.

Accordingly, the order denying qualified immunity is REVERSED and we direct the entry of judgment in favor of defendants Rilling, Nook and Hine on all outstanding claims.